IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JULIAN B. MENDOZA,                    )
                                      )
            Plaintiff                 )        Civil No. 08-3090-HU
                                      )
        v.                            )        OPINION AND ORDER
                                      )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

Arthur W. Stevens III
Black, Chapman, Webber, Stevens
Peterson & Lundblade
221 Stewart Ave. Suite 209
Medford, OR 97501
        Attorney for Plaintiff

KENT ROBINSON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

LEISA A. WOLF
Special Assistant U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075

        Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Julian Mendoza ("Mendoza") seeks judicial review of the Social Security Commissioner's final decision denying his applications for Child Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).

For the following reasons, the Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this opinion and order.

## PROCEDURAL BACKGROUND

Born in 1982, Mendoza applied for Child DIB and SSI on February 7, 2006. Tr. 94-99. Mendoza alleges disability since birth due to Ehler-Danlos syndrome, anxiety, and depression. Tr. 103. Mendoza's applications were denied initially and upon reconsideration. Tr. 56-78. An Administrative Law Judge ("ALJ") held a hearing on October 15, 2007. Tr. 23-55. The ALJ subsequently found Mendoza not disabled on December 27, 2007. Tr. 13-22. The Appeals Council denied review of the ALJ's decision on June 20, 2008. Tr. 1-2.

## BACKGROUND

### I.   Medical Record

The record before this court shows that Mendoza was diagnosed with Ehlers-Danlos syndrome type III ("EDS")[1] at age twelve in November 1994, by Dr. Grompe, a genetic disorders

---

[1]Ehlers-Danlos syndrome is a "hereditary disorder of connective tissue, marked by hyperplasticity of the skin, tissue fragility, and hypermobility of joints. Minor trauma may cause

specialist, based on clinical examination.  Tr. 186-87.  Dr. Menashe, a pediatric cardiologist, concurrently ruled out Marfan syndrome (Tr. 185), although Dr. Grompe's November 21, 1994, chart note stated that Mendoza's skeletal measurements were consistent with Marfan syndrome.  Tr. 187.

The record before this court shows that orthopedist Dr. Morrison treated between April 1993 and February 1998.  Tr. 219-224.  In April 1993, when Mendoza was approximately eleven, Dr. Morrison treated Mendoza's left knee pain and dysfunction.  Tr. 224.  Here Dr. Morrison noted that Mendoza first received treatment for his knee dysfunction "about six years ago," when Mendoza was approximately five.  Tr. 224.  Mendoza subsequently received arthroscopic knee surgery on July 13, 1993.  Tr. 223.  The surgical report indicates no significant abnormalities other than "hemorrhage in the area of the vastus lateralis."  Tr. 223.  In August 1995 Dr. Morrison noted minimal change in Mendoza's scoliosis between August 1994 and August 1995.  Tr. 220.  Dr. Morrison continued to find Mendoza's scoliosis and knee laxity directly attributably to Mendoza's EDS.  *Id.*

In 1996 Mendoza received treatment from emergency rooms and general practitioners for separately sustained fractures of his finger and forearm.  Tr. 219-221.

Treating physician Dr. Ewald assumed care of Mendoza between February 2002 and May 2007, when the record before this court closes.  Tr. 254-60, 272-74.  On February 11, 2002, Dr. Ewald described Mendoza's history of left knee surgery, noting that Mendoza experiences severe pain with any external rotation of his left leg, as well as left ankle pain.  Tr. 259.  Dr. Ewald specifically found that Mendoza exhibited "no chronic pain behavior."  *Id.*  Dr. Ewald diagnosed

---

a gaping wound with little bleeding.  Sprains, joint dislocations, and synovial effusions are common; life expectancy is usually normal.  Treatment includes symptomatic therapy and emotional support . . . and emphasis on avoiding trauma in childhood."  Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* ( 5th ed. 1998).

3 - OPINION AND ORDER

EDS, chronic abdominal pain of unknown etiology, chronic left knee pain, thoracic scoliosis, and chest wall pain. *Id.* Dr. Ewald prescribed Celebrex and instructed that Mendoza follow-up with orthopedist Dr. Morrison as needed. *Id.*

In July 2002 Dr. Kuzmitz[2] noted Mendoza's reported left eye discomfort and diagnosed acute conjunctivitis. Tr. 258. In September 2004, Dr. Ewald diagnosed right trapezius pain secondary to a cervical facet joint problem, and left sacro-illiac joint pain secondary to malalignment of that joint. Tr. 258. Dr. Ewald found that both diagnoses were related to Mendoza's EDS.

In April 2005 Mendoza, now age twenty three, reported shortness of breath and suicidal ideation. Tr. 257. Dr. Ewald diagnosed a viral upper respiratory infection, which he found secondary to EDS. *Id.* Dr. Ewald also diagnosed unipolar depression and treated Mendoza with Lexapro, which made Mendoza disoriented, and in May 2005 prescribed Prozac. *Id.* In June 2005 treating physician Dr. Sager, Dr. Ewald's partner, diagnosed bronchitis. *Id.*

Dr. Ewald continued to treat Mendoza between November 2006 and September 2007, when the record before this court closes. Dr. Ewald diagnosed otitis externa causing right ear pain in April and May 2007. Tr. 272.

On September 28, 2007, Dr. Ewald wrote a detailed letter to the record describing Mendoza's condition, treatment, and limitations. Tr. 275-76. Dr. Ewald explained that the underlying pathology in EDS type III is "defect in elastic tissue. Joints become excessively mobile and tend to wear out. There is also some risk of dilation and rupture of major blood vessels in type IV EDS." Tr. 275. Dr. Ewald noted Mendoza's clinical complaints of joint pain and treatment with long-acting narcotics.

---

[2]Dr. Kuzmitz's July 2, 2002, chart note is incorporated into Dr. Ewald's clinical record. Tr. 258.

4 - OPINION AND ORDER

Here Dr. Ewald stated that Mendoza's life "has become fairly severely limited" due to his EDS symptoms.  *Id.*  Dr. Ewald concluded that Mendoza "has been quite compliant with our therapies, but therapy for his congenital condition . . .  is quite limited.  There is no cure for it."  *Id.*

## II.    Mendoza's Testimony

Mendoza submitted to the record several Disability Determination Services[3] ("DDS") questionnaires, an email dated October 21, 2006, and testified at his October 2007 hearing.

### A.    Mendoza's DDS Questionnaires

Mendoza completed three DDS questionnaires in February 2006.  Tr. 122-36.  First, Mendoza completed a DDS Adult Function Report on February 26, 2006.  Tr. 122-29.  Mendoza stated that he feeds the fish, his father cares for his cat, and that he performs cleaning and unspecified "repairs" a "few times a week."  Tr. 123-24.  Mendoza stated that he cannot drive because sitting for an "extended period of time" is uncomfortable.  Tr. 125.  He indicated that his hobbies include computers, art, games, crafts, and watching television and movies.  Tr. 126.  Mendoza also stated that he used to be able to perform physical activities such as mountain biking and skiing, which he can no longer do.  Regarding his social activities, Mendoza wrote that he talks with and sees friends a "couple times" per week.  *Id.*  Finally, Mendoza indicated that he is limited in lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs.  Tr. 127.  Mendoza stated that he can walk about a mile, and then must rest for approximately a half hour.  *Id.*  Mendoza also indicated that he believes he is unusually shy and anxious.  Tr. 128.

Mendoza next completed a DDS pain questionnaire on February 26, 2006.  Tr. 130-32.

---

[3]DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. §§ 404.1503; 416.903.

Mendoza wrote that walking and standing causes knee pain, and sitting causes hip and back pain. Tr. 130.  He stated that he can no longer bicycle or ski, and that he requires rest after an hour of activity.  Tr. 131.  Mendoza indicated that he "never" takes walks, completes household tasks such as laundry on a monthly basis, and that his father does most of the household chores.  Tr. 132.

Mendoza also completed a DDS fatigue questionnaire on February 26, 2006.  Tr. 133-136. Mendoza wrote that he first began to experience fatigue in his mid-teens, and that he rests or naps daily for an hour or two.  Tr. 133.  He also wrote that he requires frequent breaks in performing any kind of physical activity.  *Id.*  Mendoza indicated that he cooks and cleans weekly, and that he does laundry monthly.  Tr. 134.  Finally, Mendoza indicated that he can walk or stand for one hour, sit for two hours, occasionally bend, occasionally lift twenty pounds, and frequently reach.  Tr. 135.

### B.    Mendoza's October 2006 Email

Mendoza's October 2006 email stated that some days he eats breakfast, and other days he remains laying down in the morning due to pain.  Tr. 159.  Mendoza also wrote:

> Most of the time during the day I am laying down.  I used to be able to sit most of the day but now it is too difficult.  My room is arranged so that I can be on my computer while laying down.  I communicate with friends, play video games, watch movies.  Occasionally friends visit me and sometimes I go out with them.  Sometimes it takes me several days to recuperate from the pain of doing too much- my knees, shoulders, back and hip joints cause me pain.  I occasionally use pain medication and/or anti-anxiety medication when I feel the pain is overwhelming and the stress is too great.  I talk with my mom and sisters weekly and spend time with my mom about every other week.

*Id.*  Mendoza concluded that he can no longer do activities such as bicycling, skiing, hiking, and exploring.  *Id.*  Finally, Mendoza stated that, "Getting into cars, riding in cars, sitting for plane flights and walking all cause me to feel fear that my knee will dislocate."  *Id.*

### C.    Mendoza's Hearing Testimony

Mendoza testified at his October 15, 2007, hearing before the ALJ.  Tr. 27-34.  Mendoza first stated that he has "chronic pain in all my joints," which produces good days and bad days.  Tr. 27-28. Mendoza explained that if he over exerts himself on a good day, he will be in pain for the following week.  Tr. 28.  Mendoza also testified that if he is one position too long he becomes stiff.  He deals with this by moving between his bed, a chair, and standing, and back to bed.  *Id.*  When asked to explain his joint pain, Mendoza testified that his joints are "very lax and can twist and bend and get out of place very easily.  So . . . getting into a car is tricky . . . because you have to twist your legs to get into a car."  Tr. 29.  Mendoza stated that his EDS first began to effect him at approximately age twelve.  Tr. 30.

Mendoza also testified that his EDS effects his stomach and digestion as well.  *Id.* Specifically, Mendoza stated that digestion can be "very uncomfortable" and that he has diarrhea and constipation "a lot."  *Id.*  Finally, Mendoza also testified that he is taking antidepressant and anxiety medication, and that he is "very" anxious.  Tr. 30-31.

Regarding his social activities, Mendoza stated that he cannot do sports activities with his friends, and that he has "kind of withdrawn" into his room where he has a bed and chair and can interact with people using his computer.  *Id.*  Mendoza testified that he has been in this environment "for the past four years."  *Id.*  Mendoza explained that he attempted a computer systems internship for four hours per week, but that this "wasn't possible" because he could perform the first day, and then would miss the second day due to increased symptoms, or perform two days, and consequently miss the rest of the week due to increased symptoms.  Tr. 31-32.

///

7 - OPINION AND ORDER

III.    **Lay Witness Testimony**

Both of Mendoza's parents testified at his October 2007 hearing.  Mendoza's mother additionally submitted statements to the record.

A.    **Testimony of Joanna Bradley**

Joanna Bradley, Mendoza's mother, testified at Mendoza's October 2007 hearing and additionally submitted a third party report to the record.  Tr. 35-42, 114-121.

a.    **Bradley's Third Party Report**

On February 25, 2006, Bradley wrote that she sees Mendoza every few weeks.  Tr. 114.  Bradley stated that Mendoza spends most of his time on his computer, resting, or visiting with friends, and that Mendoza occasionally goes out with family or friends.  *Id.* Bradley indicated that Mendoza feeds his cat, with help from his father (*id.*), and that he can perform household cleaning, laundry, and repairs, but cannot lift, carry, or push heavy items.  Tr. 116.  Bradley wrote that Mendoza has experienced knee dislocations since age seven, and "continued to be fairly active for several more years until he began having severe joint pain."  Tr. 115.  Bradley continued that Mendoza is "very achy at night since he has severe joint pain - all over his body."  *Id.*

Bradley also stated that Mendoza eats a wide variety of foods, but has "constant" digestive problems and can only eat small meals.  Tr. 116.  She also wrote that Mendoza cannot do "certain things" because his joints are fragile, and "it is hard for him to sit in a car."  Tr. 117.  Bradley stated that "it is hard for him to stand and walk for long periods and [he] is uncomfortable in large crowds." *Id.*  She also stated that Mendoza's ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs is effected by his impairments, and that Mendoza has been "progressively getting physically weaker. He can lift 20 pounds, his knees are very fragile and he doesn't kneel or squat.  Sitting for more than

15 minutes in one place is painful.  Standing and walking are ok for 45 minutes." Tr. 119.  Bradley indicated that he may walk one mile before requiring rest and can resume walking after thirty minutes to one hour.  *Id.*

Regarding Mendoza's social activities, Bradley wrote that Mendoza visits with friends, plays computer games, and occasionally talks on the phone. Tr. 118.  She also wrote that Mendoza "goes out very rarely- he is uncomfortable with people and is very shy."  *Id.*  Bradley continued that Mendoza was "pretty social until his midteens[.]  Then he was depressed, had a lot of physical pain and withdrew."  Tr. 119.

### b.    Bradley's Hearing Testimony

Bradley testified at Mendoza's hearing that Mendoza began experiencing stiffness which limited his movement at age eleven or twelve.  Tr. 36.  She described Mendoza as a "very active little boy," who began experiencing increasing joint impairments and depression as he became an adolescent. Tr. 36-37.  She also stated that as Mendoza got older "he just withdrew more and more, became less and less comfortable moving fast and just found a way to function where he just didn't have to move very much at all, and became pretty much bed bound."  Tr. 37.  Finally, Bradley affirmed that Mendoza has been in this "status" since January 3, 2004, and that Mendoza has spent increasing amounts of time confined to his room, and eventually his bed, in the past three years.  Tr. 38.

Bradley also testified that Mendoza received treatment from a pediatrician as a child, and transferred his care to general practitioner Dr. Ewald, a family friend, he when he was "16 or so." Tr. 40.

///

9 - OPINION AND ORDER

### B.    Testimony of Jorge Mendoza

Jorge Mendoza, Mendoza's father, also testified at Mendoza's October 2007 hearing.  Tr. 43-49.  Jorge Mendoza stated that Mendoza's daily routine "changes, meaning it depends . . . if he takes a walk for two blocks, then he's in pain for the next two or three days.  If he's anxious, like now, this last week because of this meeting, he's been sleeping maybe two hours a night, or three days without sleeping."  Tr. 43.  Jorge Mendoza testified that Mendoza has "two or three" friends who visit him at home, and that Mendoza "clearly" has "enormous" anxiety whenever he leaves the house.  *Id.*  Jorge Mendoza finally stated that Mendoza has pain in his knees and his back following any activity, explaining that Mendoza's pain increases with any bent-leg posture, and that while he can stand for hours, he is subsequently in pain for days after such prolonged standing.  Tr. 45.

## DISABILITY ANALYSIS

Children may be entitled to Title II disability insurance benefits based upon the earnings record of an insured parent.  20 C.F.R. § 404.350(a).  In construing an initial disability determination under Title II, the Commissioner engages in a sequential process encompassing between one and five steps.  20 C.F.R. § 404.1520, *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  The Commissioner applies the same analysis to SSI claims.  20 C.F.R. § 416.920.

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If he is, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement.  20 C.F.R. §§ 404.1509; 416.909; 404.1520(a)(4)(ii); 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, he is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals a "listed" impairment in the regulations.    20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii).    If the impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his impairments.  20 C.F.R. §§ 404.1520(e); 416.920(e), Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four.  20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  If the claimant can perform his past relevant work, he is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of his past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy. *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1520(f); 416.920(a)(4)(v); 416.920(f).  If the claimant cannot perform such work, he is disabled. *Id.*

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098.  If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 C.F.R. §§  404.1520(g); 404.1566; 416.920(g); 416.966.

11 - OPINION AND ORDER

## THE ALJ'S FINDINGS

The ALJ found Mendoza's EDS, type III, with hypermobility of the knees, "severe" at step

two in the sequential proceedings.[4]  The ALJ found that Mendoza's impairment did not meet a

"listed" disorder and assessed Mendoza's RFC:

> [T]he claimant has the residual functional capacity to lift a maximum
> of 20 pounds occasionally and 10 pounds frequently; he can be on his
> feet no more than 1 hour at a time (at least 2 hours in 8); walk no
> more than 2 blocks at a time; sit for 2 hours at a time for a total of at
> least 6 hours in an 8 hour workday; with option to change positions
> at will.  The claimant is precluded from awkward positions, such as
> crawling under desks or repetitively getting into or out of vehicles. He
> has difficulty working [sic] uphill or walking at a fast pace.  He can
> rarely stoop, kneel, crouch or crawl.  The claimant is precluded from
> climbing ladders or exposure to dangerous hazards.  The claimant
> needs access to restroom facilities.

Tr. 16.  The ALJ subsequently found this RFC allows Mendoza to perform work in the national

economy as a dispatcher, small products assembler, and optical goods assembler.  Tr. 21-22.  The

ALJ therefore found Mendoza not disabled.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied

proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

§ 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir.

2004).  This court must weigh "both the evidence that supports and detracts" from the ALJ's

conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The reviewing court "may

---

[4]The ALJ also stated that "there is no support for a severe impairment dating back to the
claimant's birth . . . ."  Tr. 20.  Because the ALJ concluded that Mendoza has had a severe
impairment since January 3, 1982 (the date of his birth), and proceeded through the remaining
steps of the sequential analysis based upon this finding, the court disregards this dicta.

not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). When reviewing a credibility finding, the court must consider whether the Commissioner provided "clear and convincing reasons" for finding a claimant not credible. *Reddick v. Chater*, 157 F.3d, 715, 722 (9th Cir. 1998). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record. *Magallanes*, 881 F.2d at 750; *see* also *Batson*, 359 F.3d at 1193.

## DISCUSSION

Mendoza contends that the ALJ improperly evaluated his testimony and the opinion of treating physician Dr. Ewald. Mendoza also asserts that the ALJ erroneously evaluated lay testimony submitted by his parents. Mendoza consequently contends that the ALJ improperly found him not disabled.

## I.    Credibility

Mendoza contends that the ALJ failed to provide appropriate reasons for discrediting his testimony. Pl.'s Opening Br. 11-13. The Commissioner cites the appropriate legal standard, but fails to address Mendoza's argument and to cite either the record or the ALJ's decision in asserting that the ALJ made a proper credibility determination. Def.'s Br. 8-9.

### A.    Credibility Standard

The ALJ must evaluate a claimant's credibility in order to properly consider the claimant's testimony regarding symptoms and pain. The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Once a claimant shows an underlying impairment, the ALJ may not, however, make a negative credibility finding "solely

because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Social Security Administration*, 466 F.3d 880, 883 (9th Cir. 2006). In making credibility findings, the ALJ may consider objective medical evidence and the claimant's treatment history, including any failure to seek treatment, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id*.

**B.    Credibility Analysis**

The ALJ made no identifiable credibility conclusion regarding Mendoza's testimony, but inferred that Mendoza was not credible for two reasons. First, the ALJ found that Mendoza's answers to DDS questionnaires showed higher functioning than Mendoza's testimony at his October 2007 hearing. Tr. 19. Second, the ALJ found Mendoza's activities of daily living inconsistent with his hearing testimony. *Id.*

The ALJ first discussed Mendoza's hearing testimony in detail. Tr. 17-18. The ALJ noted Mendoza's testimony regarding his knee and hip pain, and Mendoza's statement that his activities have been restricted since reaching age twenty. Tr. 17. The ALJ cited Mendoza's report that his knees "lock up" with rotation, and that his EDS causes gastrointestinal symptoms. *Id.* The ALJ also cited Mendoza's testimony that he watches movies with his friends when they visit him, and his social isolation at other times. *Id.* Finally, the ALJ discussed Mendoza's computer repair internship. Tr. 17-18.

The ALJ subsequently found this testimony inconsistent with Mendoza's answers in a

February 2006 DDS fatigue questionnaire and Mendoza's October 21, 2006. Tr. 19.  The ALJ first

noted that Mendoza wrote that he could be active for one to two hours before requiring rest, and that

he could walk one hour, stand one hour, and sit two hours before requiring rest.  *Id.*  The ALJ then

discussed Mendoza's October 2006 email.  *Id.*  The ALJ reiterated Mendoza's statements that most

activity causes him fear that his knees will dysfunction, and concluded, "however, according to

[Mendoza's] father's testimony, the claimant had no ER visits related to his knees in the prior two

years from the hearing date in October 2007.  The claimant's functional abilities appear significantly

higher in the Social Security questionnaires than the testimonies."  Tr. 19.

The ALJ may cite contradictory testimony in discrediting a claimant.  *Smolen*, 80 F.3d at

1284.  However, the ALJ may not penalize a claimant for attempting to lead a normal life in spite

of his disability.  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  The ALJ's reliance upon

Mendoza's limited activities in finding his testimony and his DDS submissions inconsistent is

therefore not based upon the proper legal standards.

The ALJ's statement regarding Mendoza's emergency room visits furthermore does not

establish an inference that Mendoza is not credible regarding his fear of dislocating his knees.  While

this court must affirm inferences reasonably drawn, *Batson*, 359 F.3d at 1193, the ALJ's inference

is speculative.  The medical evidence, discussed above, establishes that Mendoza has joint laxity,

especially regarding his knees.  The ALJ's inference regarding emergency room treatment therefore

does not sufficiently discredit Mendoza's articulated fear that he will dislocate his knees with

activity.  It is at least equally likely the fear is real and causes Mendoza to limit his activities so as

to avoid dislocation.

In summary, the record does not support the contradictions identified by the ALJ in

discrediting Mendoza.  The ALJ's reasoning is therefore not based upon the record and does not sufficiently discredit Mendoza.  The ALJ's rejection of Mendoza's testimony is not appropriate. Mendoza's testimony is credited for reasons explained more fully below.

## II.   Medical Source Statements

Mendoza contents that the ALJ improperly evaluated treating physician Dr. Ewald's opinion. The record before this court, discussed above, shows that Dr. Ewald was Mendoza's primary treating physician between February 2002 and April 2006, when the record closes.  Tr. 254-60, 272-74.  During this period Dr. Ewald followed Mendoza's EDS.  Dr. Ewald additionally diagnosed and treated Mendoza's depression, anxiety, respiratory infections, and chronic pain.  *Id.*

On September 28, 2007, Dr. Ewald wrote a letter to the record.  Tr. 275-76.  Dr. Ewald explained that the underlying pathology in EDS type III is a defect in elastic tissue, and that "joints become excessively mobile and tend to wear out."  Tr. 275.  Dr. Ewald also explained that Mendoza may have some "crossover" with EDS type IV, which has associated risk of dilation and rupture of major blood vessels.  *Id.*

Dr. Ewald stated that he has known Mendoza since 1983 (when Mendoza was approximately one year old) and that Mendoza has degenerative joint disease of the knees, which is worse on the left, due to excessive mobility.  Dr. Ewald also stated that Mendoza has scoliosis of the thoracic spine, causing upper and occasional low back pain, as well as chest cavity deformities, which also cause pain and predispose Mendoza to upper respiratory infections.  *Id.*

Dr. Ewald additionally explained that Mendoza has a social anxiety disorder, which has "manifested by social withdrawal and fear of contact with social situations."  Tr. 275.  Dr. Ewald wrote that Mendoza requires long-acting narcotics for his chronic pain, which are "partially helpful"

but decrease his physical abilities.  Dr. Ewald concluded by stating that there is no cure for Ehler-Danlos syndrome, and that he believes Mendoza is permanently unable to sustain gainful employment.  Tr. 275-76.

The ALJ did not cite Dr. Ewald's clinical notes and opinions in his discussion of Mendoza's treating and examining physicians.  Tr. 16-17.  The ALJ instead noted Dr. Ewald's letter and residual functional capacity questionnaire and gave Dr. Ewald's opinion "less weight because it is not corroborated by the record."  Tr. 20.  The ALJ additionally rejected Dr. Ewald's opinion because disability opinions are reserved for the Commissioner.  *Id.*

### A.     Legal Standards: Physician Opinions

Generally, a treating physician's opinion is accorded greater weight than that of an examining physician.  *Edlund*, 253 F.3d at 1157.  An examining physician's opinion is in turn accorded more weight than that of a reviewing physician.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  If the opinion of a treating or examining physician is contradicted, then an ALJ need only set out specific and legitimate reasons supported by substantial evidence.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  If the medical opinion is uncontradicted, the ALJ must identify "clear and convincing" reasons for rejecting such opinions.  *Id.*

### B.     Analysis

#### a.     Referral Source

The ALJ first noted that Dr. Ewald stated that he had known Mendoza since 1983, but failed to state that he was a family friend "rather than a treating source."  Tr. 20.  Mendoza and his mother, Joanna Bradley, both testified that Dr. Ewald is a family friend.  Tr. 29, 40.  However, the ALJ may not reject a properly supported physician's opinion based upon the source of a referral.  *Nguyen v.*

*Chater*, 100 F.3d 1462, 1465 (9th Cir. 1995).  There is nothing in the record to suggest Dr. Ewald is not a treating doctor.  The ALJ's observation regarding Dr. Ewald's friendship with Mendoza's family does not discredit Dr. Ewald's opinion so far as it is supported by his clinical notes and findings.  This reasoning is rejected.

### b.    Dr. Ewald's Clinical Opinion

The ALJ also failed to note that Dr. Ewald's opinion is supported by treatment notes produced throughout the period between February 2002 and April 2006.  Tr. 253-63; 270-74.  The ALJ instead found that Dr. Ewald's opinion regarding Mendoza's degenerative joint disease of the knee is contradicted by imaging studies.  Tr. 20 (citing Ex. 7F; 6F; 5F; 3F).  The ALJ's citation refers to July 2001 emergency room notes and Mendoza's November 1994 EDS diagnosis, as well as a DDS reviewing physician's opinion.  Tr. 20 (citing Ex. 5F).

A July 3, 2001,  emergency room chart note states that Mendoza had a "probable meniscal injury," without any concurrent imaging studies.  Tr. 211.  This citation does not contradict Dr. Ewald's opinion regarding Mendoza's knee.  A subsequent July 14, 2001, emergency room chart notes address Mendoza's right groin pain due to a ureter obstruction.  Tr. 200.  This citation does not address any aspect of Dr. Ewald's opinion regarding Mendoza's EDS or joint functions.

Dr. Grompe's November 1994 chart note addresses Mendoza's original EDS diagnosis in 1994 and does not contradict Dr. Ewald's opinion regarding Mendoza's functioning between February 2002 and April 2006.  The ALJ's reliance on this note to reject Dr. Ewald's opinion is misplaced.

Finally, the ALJ cites a DDS reviewing physician's opinion that had rejected Dr. Ewald's finding.  Tr. 20 (citing Ex. 7F).  A reviewing physician's opinion cannot by itself constitute

substantial evidence justifying rejection of either an examining or treating physician's opinion. *Lester*, 81 F.3d at 831. Here, the reviewing physician rejected Dr. Ewald's opinion because he found that Mendoza engaged in greater social activity than Dr. Ewald's suggested. Tr. 231. The ALJ did not articulate this reasoning, and this reasoning alone does not constitute substantial evidence for rejecting Dr. Ewald's opinion regarding Mendoza's joint pain between February 2002 and April 2006.

Further, the court notes that the ALJ's citation to Exhibits 3F, 5F, 6F, and 7F contains no pinpoint citations or explanation. This court's review of the ALJ's citations, discussed above, finds no reference to the period (2002-2006) during which Dr. Ewald treated Mendoza. For all of these reasons, the ALJ's citations do not constitute clear and convincing reasons for rejecting Dr. Ewald's uncontradicted opinion regarding Mendoza's knee impairment articulated in Dr. Ewald's September 2007 letter.

### c.    The ALJ's Additional Omissions

The ALJ did not discuss Dr. Ewald's statements regarding Mendoza's scoliosis, rib deformities and chest cavity malformation, with related chronic pain and increased risk of respiratory infection. Tr. 275. The ALJ also did not discuss Dr. Ewald's statement regarding Mendoza's depression and anxiety. Finally, the ALJ omitted any discussion of Dr. Ewald's reference to Mendoza's chronic pain medication and related side effects.

Dr. Ewald's treatment notes discuss each of these impairments in some detail. Tr. 253-63; 270-74. For this reason, the ALJ's findings regarding Dr. Ewald are not supported by the record. The ALJ's review of Dr. Ewald's clinical opinion, as well as Dr. Ewald's September 2007 letter, cannot be affirmed.

### d.    Opinions Reserved for the Commissioner

The ALJ correctly stated that disability determinations are reserved for the Commissioner. Tr. 20; 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).  However, this reservation does not allow the ALJ to reject Dr. Ewald's clinical opinion, which he must consider under the standard articulated above.  This reason alone is insufficient to reject Dr. Ewald's clinical opinion.

In summary, the ALJ's analysis of Dr. Ewald's opinion contains significant omissions by and is not based upon the proper legal standard.  Dr. Ewald's opinions are entitled to be credited on this record, as discussed more fully below.

## III.   Lay Witness Testimony

Mendoza challenges the ALJ's evaluation of testimony submitted by both his mother, Joanna Bradley, and his father, Jorge Mendoza.

### A.    Standards: Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony.   20 C.F.R. §§ 404.1513(d); 405.1545(a)(3); 416.913(d); 416.945(a)(3); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding their observations of the claimant's condition.  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  The ALJ may not reject such testimony without comment, and he must give reasons germane to the witness for rejecting lay testimony.  *Nguyen*, 100 F.3d at 1467. However, inconsistency with the medical evidence may constitute a germane reason.  *Lewis*, 236 F.3d at 512.

The reviewing court may not find an ALJ's omission of lay testimony harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the improperly omitted testimony,

would reach a different disability determination. *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006).

###    B.    Analysis: Lay Witness Testimony

The ALJ rejected the testimony of both Joanna Bradley and Jorge Mendoza because he found unidentified "inconsistencies" in their testimonies. Tr. 20. The ALJ's analysis pertaining to both Bradley and Jorge Mendoza's testimony repeatedly noted that Bradley characterized her son as "bed bound," and then found that the remaining lay testimony contradicted this statement. Tr. 19-20. The ALJ based this reasoning upon Bradley's responses to a DDS questionnaire, which he found "indicate that at least as of February 2006, the claimant's functional abilities surpassed those testified to at the hearing by the claimant and his witnesses." Tr. 20.

Bradley testified that Mendoza spent greater amounts of time in his room, at times in bed, as his teenage years progressed. Tr. 39. She explained that it is "uncomfortable" for Mendoza to sit at his computer, and that he turns his computer towards his bed so that he may lay down. *Id.* Bradley estimated that this behavior has occurred for "four years or so, four or five years." *Id.*

The DDS questionnaire cited by the ALJ does not contradict Bradley's statement that Mendoza prefers to lie on his bed because he cannot sit for long periods. The questionnaire submitted by Bradley shows that she stated that Mendoza is "usually" on his computer, resting, or visiting with friends, and that "it is hard for him to stand and walk for long periods." Tr. 114, 117. Bradley also stated that Mendoza visits with friends, plays computer games, and talks on the phone. Tr. 118. She did not indicate whether Mendoza performs these activities sitting, standing, or laying on his bed. Notably, Bradley testified that Mendoza's room is furnished so that he may perform all of these activities on his bed rather than sitting in a chair. Tr. 39. Therefore, Bradley's responses

to the DDS questionnaire do not discredit the testimony of either Bradley or Jorge Mendoza at Mendoza's October 2007 hearing.  The ALJ's assessment of their testimony is not sustained.

## REMAND

The ALJ erroneously evaluated Mendoza's testimony, Dr. Ewald's opinion, and the lay witness testimony.  The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Vasquez v. Astrue*, 572 F.3d 586, 601 (9th Cir. 2009)(petition for en banc review denied, *id.* at 590); *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2008) (cert. denied, 531 U.S. 1038 (2000)).  The issue turns on the utility of further proceedings. A remand for award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.  *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Harman*, 211 F.3d at 1178 (quoting *Smolen*, 80 F.3d at 1292).  The doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision.  *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Dodrill*, 12 F.3d at 919); *Bunnell v. Sullivan*, 947 F.3d 341, 348 (9th Cir. 1991) (en banc).

Here, the ALJ erroneously assessed Mendoza's testimony regarding his limitations,

22 - OPINION AND ORDER

specifically his inability to stand, sit, or perform activity without frequent rest or the ability to lie down.  The ALJ also erroneously evaluated Dr. Ewald's clinical opinion regarding Mendoza's prognosis and limitations.  Finally, the ALJ failed to appropriately evaluate the testimony of Mendoza's parents describing his limitations.

Both Mendoza and his parents testified as to Mendoza's limitations as of January 2004.  Tr. 27, 34, 38-39.  The vocational expert testified that an individual who could not stand for two hours and sit for six hours, and required the ability to recline, could not sustain employment in the national economy.  Tr. 52-53.  This testimony establishes that Mendoza is disabled from the date the limitations cited above became effective, which Mendoza and his parents indicate was January 2004.  Crediting the testimony of Mendoza, Dr. Ewald, and the lay witnesses therefore establishes that Mendoza cannot perform work in the national economy at step five of the sequential proceedings as of January 2004.  For this reason, the matter is remanded for the immediate calculation and award of benefits.

## CONCLUSION

The Commissioner's decision that Mendoza did not suffer from disability and is not entitled to benefits under Titles II and XVI of the Social Security Act is not based upon correct legal standards and is not supported by substantial evidence.  The Commissioner's decision is REVERSED and remanded for the immediate calculation and award of benefits.

IT IS SO ORDERED.

Dated this _30th_ day of September 2009.

/s/ Dennis J. Hubel

_____

Dennis James Hubel
United States Magistrate Judge

23 - OPINION AND ORDER